## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAIMADAJIE ANGWANG,<br><br>                              *Plaintiff*,<br><br>        v.<br><br>UNITED STATES OF AMERICA, CITY OF NEW YORK, MICHAEL RICCIARDI, MIGUEL IGLESIAS, DANIEL S. CUTTER, EDWARD CABAN, BRIAN SPARBER, JOHN AND JANE DOES 1–10<br><br>                              *Defendants*. | **COMPLAINT**<br><br>Case No.<br><br>**Jury Trial Demanded** |

## INTRODUCTION

1.      The American justice system presumes innocence unless proven otherwise.  But for Plaintiff Baimadajie Angwang—an immigrant who braved enemy fire as a United States marine in Afghanistan and proudly served his community as a New York City police officer—this bedrock principle was inverted: Angwang was presumed guilty of crimes that he did not commit.  For nearly three years, Angwang was accused of being a foreign agent—a "spy"—for the People's Republic of China, despite the absence of a shred of evidence to substantiate those serious allegations—as federal prosecutors all but acknowledged in eventually dismissing the charges.  That vindication, however, came only after Angwang was detained for five months in solitary confinement, was forced to endure years of prosecution, saw his good name dragged through the mud, and eventually lost his hard-earned position as an NYPD officer.  Angwang's fundamental rights were violated.  He now seeks a remedy.

\* \* \*

2.      Until 2020, Angwang's life represented the American dream.  He immigrated to the United States as an asylum-seeker from the Tibetan area of China.  He joined the United States Marine Corps and went on to serve his adopted country in Afghanistan, becoming a decorated combat veteran.  When his Marine Corps contract ended, he signed up for the U.S. Army Reserve, but for Angwang, that wasn't even enough.  He then joined the New York Police Department ("NYPD"), where he became a leader in both the police force and the broader Asian and Asian-American communities of New York City.

3.      When Angwang became a parent to his newborn daughter, he naturally sought to travel to China so that his and his wife's families could meet their grandchild.  But because of the Chinese government's longstanding suspicion of ethnic Tibetans, gaining a visa is an onerous process for individuals like Angwang.  Angwang therefore developed a respectful, but wholly innocuous, relationship with certain low-level employees at the Chinese Consulate in Manhattan. These communications—which Angwang conducted on his personal cell phone, rather than a burner phone or through encryption as would befit a "spy"—were intercepted and recorded by warrant pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA").

4.      Thus, beginning in 2020, the American life featuring hard work and deserved accomplishment that Angwang built painstakingly, over years, for himself and for his family was ripped apart.  Based on these innocuous communications that Angwang had with consular employees, law enforcement concocted wholly fabricated charges that Angwang was a foreign agent for the Chinese government, ginned up amidst a McCarthyite fervor that presumed that Chinese-Americans were traitors.

5.      The Complaint filed against Angwang relied almost entirely on an affidavit drafted by Federal Bureau of Investigation ("FBI") Special Agent Stephen Deck.  But what Mr. Deck

labeled an affidavit was, in reality, a smear masquerading as sworn testimony and a wild distortion of the evidence that is wholly unbecoming of a federal officer.  Mr. Deck's affidavit peddled a series of mistranslations of Angwang's communications from Mandarin into English in an attempt to falsely implicate Angwang.  For example, Angwang's Mandarin phrasing was mistranslated into English to falsely suggest that he had referred to one of the consular employees as "boss" and that the PRC had "recruited" him in the NYPD.  But Angwang said nothing of the sort.  Worse, Mr. Deck attributes deeply incriminating statements to Angwang that he simply never said, including a series of wholly baseless and false accusations that Angwang offered to spy on the Tibetan community or develop intelligence assets and sources for China.  Further obfuscating the true nature of these innocuous exchanges, Mr. Deck's affidavit omitted a trove of communications that did not fit his pre-conceived narrative.  The full context would have made even more clear the wholly innocent nature of Angwang's relationship with these consular employees and would have exculpated Angwang entirely.

6.      But because of this falsified evidence, federal agents arrested Angwang at gunpoint in front of his wife and toddler daughter.  The federal government and the NYPD then plastered Angwang's name far-and-wide, impugning Angwang as a traitor and a spy.  The press swarmed. Despite Angwang's service to his country and the NYPD, NYPD Commissioner Dermot Shea accused Angwang on national TV of betraying his country and prayed that he hoped Angwang would be brought to justice.

7.      Angwang was indicted after the same false and misleading evidence was presented to the grand jury.  He was subsequently denied bail and detained pretrial like a hardened criminal, which resulted in his serving five months in solitary confinement at the peak of the COVID-19 pandemic at the Metropolitan Detention Center ("MDC") in Brooklyn.  For Angwang, the already

notorious conditions of the MDC were exponentially worse given the impact of the pandemic on jails and prisons and the rise in extreme anti-Asian sentiment during the same period.[1]  He was unjustly prosecuted for nearly three years.

8.    The tide began to turn in early 2023, when federal prosecutors abruptly dismissed the indictment—and for good reason: not a shred of evidence supported the charges.  But during that time, Angwang suffered a prolonged deprivation of liberty in abysmal conditions, lost wages, and incalculable emotional and reputational harm.  He missed formative months in his young daughter's life.

9.    And even with the dismissal of the federal charges in January 2023, Angwang's ordeal was not over.

10.    Naturally, Angwang spoke out about the injustice he had suffered and he attempted to regain some sense of normalcy at the NYPD.  He told the public press that he had been the victim of overzealous and racially motivated prosecution and he filed a Notice of Claim announcing that he would seek legal relief against the City of New York in connection with his unlawful arrest and detention.  After Angwang made those public statements, months after the dismissal of the federal charges, and after Angwang had filed the Notice of Claim, the NYPD initiated an investigation against Angwang for the very same charges that federal prosecutors had *already* investigated for years and dismissed.  A second witchhunt ensued.

11.    The NYPD tried to subject Angwang to 1,700 questions in a sham investigatory interrogation, a near singularity in NYPD disciplinary history.  When, through counsel, Angwang

---

[1] See generally *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024) (detailing the outrageously poor conditions of the MDC before, during, and since the onset of the Covid-19 pandemic in 2020); https://pmc.ncbi.nlm.nih.gov/articles/PMC9168424/#:~:text=Following%20the%20onset%20of%20the,also%20at%20risk%20for%20victimization (describing the spike in anti-Asian hate crimes during the early stages of the Covid-19 pandemic).

sought to gain a modicum of due process, such as access to the documents on which he would be interrogated, the NYPD refused, and Angwang was charged with refusing a lawful order. The NYPD then set aside its false charges related to Angwang acting as a foreign agent, as the federal government already had, but now moved to terminate Angwang based on this new pretextual procedural charge. And although an NYPD trial commissioner determined that Angwang should engage in a post-trial settlement negotiation to separate from the NYPD, the higher-ups ignored that recommendation, including then Commissioner Edward Caban. Indeed, even the draconian punishment of terminating Angwang from the law enforcement agency he once revered was not enough for Defendant Caban. Against the trial commissioner's recommendation and longstanding NYPD precedent of either accepting that recommendation or imposing a downward departure, Defendant Caban ordered Angwang's immediate dismissal. Centered on the same false charges that had unlawfully imprisoned Angwang, Angwang now lost his coveted and hard-earned employment at the NYPD.

12.     It was the capstone event of Angwang's American dream becoming an American nightmare.

## **JURISDICTION AND VENUE**

13.     This Court thus has jurisdiction over Angwang's claims pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because this action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680; 42 U.S.C. §§ 1981, 1983; New York state law, N.Y. Exec. Law § 296; and New York City law, N.Y.C. Admin. Code § 8-107, and N.Y.C. Admin Code § 8-803.

14.     Venue lies in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Angwang's claims occurred in this District.

15.     On June 15, 2023, Angwang submitted administrative tort claims to the United

States Department of Justice and to the FBI National Headquarters and New York Field Office for a sum certain; more than six months have passed since the filing of those administrative claims without action by the agencies; and Angwang has thus exhausted all administrative remedies under 28 U.S.C. § 2675(a).

## **PARTIES**

16.     Plaintiff Baimadajie Angwang is a resident of Nassau County, New York, a military veteran, and a former officer of the NYPD who was at all relevant times employed by Defendant City of New York.

17.     Defendant United States of America is a sovereign entity which has waived sovereign immunity and is an appropriate defendant pursuant to the FTCA.  28 U.S.C. § 2674.

18.     Defendant City of New York is a municipal corporation within the State of New York.  Pursuant to § 431 of its Charter, the City of New York has established and maintains the New York City Department of Police ("NYPD") as a constituent department or agency.

19.     Defendant Edward A. Caban was at all relevant times employed by the NYPD and served as Commissioner of the NYPD.

20.     Defendant Daniel S. Cutter was at all relevant times employed by the NYPD and served as a lieutenant of the NYPD.

21.     Defendant Michael Ricciardi was at all relevant times employed by the NYPD and served as an inspector of the NYPD.

22.     Defendant Miguel Iglesias was at all relevant times employed by the NYPD and served as Chief of the Internal Affairs Bureau of the NYPD.

23.     Defendant Brian Sparber was at all relevant times employed by the NYPD and served as an officer of the NYPD.

6

24.     John and Jane Does #1-10 (the "Doe Defendants") were at all relevant times employed by the NYPD.

25.     Defendants Caban, Cutter, Sparber, Ricciardi, Iglesias, and the Doe Defendants ("the Individual NYPD Defendants") are each a "person" under 42 U.S.C. § 1983 and are sued in their individual capacities.

26.     Upon information and belief, at all relevant times, the Individual NYPD Defendants were acting under the color of state law.

## STATEMENT OF FACTS

I.     **Angwang's Pursuit and Embodiment of the American Dream**

A.  **Angwang is Born in Tibet and Immigrates to the United States**

27.     Angwang was born in 1986 in the Tibetan region of the People's Republic of China ("PRC" or "China").

28.     Angwang and his parents are ethnic Tibetans.

29.     Angwang is racially Asian and of Tibetan ethnic origin and Chinese national origin.

30.     When he was around 17 years old, Angwang obtained a student visa and moved to the United States, where he lived with his uncle.

31.     Angwang initially applied for asylum in the United States due to circumstances in China but had his application denied due to a lack of English proficiency, which had affected his ability to communicate his story to the interviewer without a translator.

32.     After Angwang gained the assistance of a court translator during the rehearing of his asylum application, he was granted asylum.

33.     In 2010, Angwang became a naturalized United States citizen and took an oath of allegiance to the United States.

### B. Angwang's Exemplary and Decorated Service to the Military and NYPD

34.    Once Angwang was granted asylum, he was eager to serve his adopted country.

35.    On April 4, 2009, Angwang enlisted in the Marine Corps.

36.    Angwang became an Individual Material Readiness List Asset Manager at an aviation squadron.

37.    On or about February 2, 2011, in connection with his service in the Marine Corps, Angwang completed a Standard Form 86 Certification ("SF-86 Form").

38.    An SF-86 Form is officially titled a "Questionnaire for National Security Positions," and is a form used by the U.S. Government to collect detailed personal history information to assist in background investigations of persons under consideration for or retention in national security positions and for positions requiring access to classified information.

39.    The SF-86 Form asks questions about, among other things, contact information, citizenship, residence, employment, education, military history, marital status, relatives, foreign contacts, foreign activities (such as foreign financial interests, foreign government contacts, and foreign countries the applicant has visited), as well as mental and emotional health, police record, drug and alcohol use, and investigations.

40.    In this February 2011 SF-86 Form, Angwang truthfully disclosed that his mother, father, and brother were citizens of China and living in China.

41.    Further, as particularly relevant here, Question 20B(4) of the SF-86 Form asked Angwang about his foreign government contacts, including whether he or any immediate family members had any contact with a foreign government, its establishment (including consulates), or its representatives.

42.    Question 20B(4) instructs the applicant to mark the question "No" if the above-

described contact was "for routine visa applications . . . or foreign travel listed below."

43.    Angwang truthfully and accurately marked "No" in response to Question 20B(4).

44.    On March 20, 2012, Angwang received a Certificate of Commendation from the Marine Corps "for outstanding performance of duty."

45.    The Commendation noted that "Corporal Angwang's exceptional professionalism, initiative, and devotion to duty were in keeping with the highest traditions of the Marine Corps and the United States Naval Service."

46.    On February 28, 2013, the Department of the Navy awarded Angwang the Navy and Marine Corp Achievement Medal for "professional achievement in the superior performance of his duties."

47.    As Angwang's initial four-year contract with the Marine Corps was coming to an end, Angwang's unit was preparing to deploy to the Helmand Province in Afghanistan.

48.    Helmand Province was one of the most dangerous and violent locations in Afghanistan at the time.

49.    Despite the imminent expiration of his contract with the Marine Corps, Angwang was deeply motivated to continue his service to his country and for his unit as it was preparing for this dangerous deployment.

50.    Angwang thus volunteered to extend his contract with the Marine Corps, knowing full well the danger of deployment.

51.    From July 2013 to February 2014, Angwang served with his fellow Marines under enemy fire and became a combat veteran.

52.    On April 30, 2014, Angwang was assessed by his Commandant as "one of the few exceptionally qualified marines."

53.    His Commandant noted that Angwang was an "[e]xceptionally strong Marine. Strong command presence.  Extremely affable, build an immediate report with all regardless of rank and status.  Simply gets stuff done without drama or complaint.  Responsible for nearly 1,000 separate assets.  Will simply shine at any organization or job assigned.  Highest recommendation for promotion and positions of greater responsibility."

54.    In April 2014, Angwang was honorably discharged from the Marine Corps with full Veterans Administration benefits.

55.    Despite his honorable discharge after serving with distinction in the Marine Corps, Angwang wanted to continue to serve the country that had adopted him.

56.    Angwang thus joined the United States Army Reserve, notwithstanding that the pay was minimal and he could be redeployed to a combat zone.

57.    On or about July 3, 2014, Angwang submitted another SF-86 Form in connection with his service for the Army Reserve.

58.    In relevant part, this SF-86 Form asked Angwang: "In the last 7 years, have you or any of your immediate family members had any contact with a foreign government, its establishment (embassies, consulates, agencies, or military services), or its representatives whether inside or outside the U.S.?"

59.    The instructions for this SF-86 Form again provided that the applicant should "[a]nswer 'No' if the contact was for routine visa applications and border crossings related to either official U.S. Government travel or foreign travel on a U.S. passport."

60.    Angwang truthfully and accurately responded "No" to this question because (as alleged in detail further below) his only contact with foreign government representatives had been in connection with a routine visa application process further to his attempts to travel to China to

see his family using his U.S. passport.

61.    In 2014, Angwang was assigned to the Airborne Civil Affairs battalion for the Army Reserve.

62.    Despite his honorable service in the Marine Corps and Army Reserve, Angwang looked for even further ways to give back to the country and community that had given him so much.

63.    Specifically, in 2013, while still serving in the Marines, Angwang began the process of becoming a police officer with the NYPD, an institution that he revered.

64.    In 2015, while Angwang was serving in the Army Reserves, Angwang's application was accepted by the NYPD, he completed the NYPD's Police Academy training, and he was assigned to the 111th Precinct in Queens.

65.    There, Angwang became a valued member of both the NYPD and the local community, which had a large Asian and Asian-American population, including ethnic Tibetans.

66.    Angwang rendered exceptional and distinguished service as an NYPD officer, serving as a liaison between the Queens community and the police force.

67.    For example, when a rash of robberies struck Asian-owned restaurants, Angwang coordinated meetings between the store owners and the police, training constituents to better protect themselves against crime and collecting information about the robbery pattern to support the NYPD's investigation.

68.    Angwang was highly regarded by his fellow NYPD officers, his superiors, and the community.

69.    Angwang was awarded the 111th Precinct "Cop of the Month" in September 2018, "in recognition of his dedication to duty and the well-being of our community."

70.    The 111th Precinct proudly announced Angwang's award on its social media account, noting that "[a]t last night's Precinct Council meeting . . . we presented our Officer of the Month Award to PO Angwang for his initiative and public service."

71.    Angwang earned "Exceeds Expectations" performance reviews from the NYPD in 2018 and 2019 and each of his reviews were glowing.

72.    For example, Angwang's performance reviews included the following:

a.    "PO Angwang is a highly motivated officer who handles his assignments with professionalism and pride. He is very well respected by his peers and his supervisors. While assigned to patrol on a daily basis, Officer Angwang takes a personal interest in addressing precinct conditions. PO Angwang is an asset to this department."

b.    "PO Angwang is always on time and punctual. PO Angwang supports department policy and his performance always reflects a high level of integrity."

c.    "PO Angwang has an excellent ability to communicate with his peers, supervisors and members of the community. He is always clear and articulate."

73.    In November 2019, in light of these accomplishments, as well as others, Angwang was appointed the 111th Precinct's Community Affairs Officer, a status that is conferred upon an officer who is trusted and who has the maturity and people skills to maintain good relations with the diverse people of New York City.

74.    Community Affairs Officers are assigned to "stay closely connected" with New York City's "many diverse communities." [2]

75.    Community Affairs Officers often worked with foreign consulates on community events.

76.    Angwang had no NYPD disciplinary history through 2019.

---

[2] https://www.nyc.gov/site/nypd/bureaus/administrative/community-affairs.page

77.     NYPD Deputy Inspector John Hall, who was a Commanding Officer overseeing the 111th Precinct during Angwang's tenure, wrote the following about Angwang on February 10, 2023 (after his criminal case was dismissed):

> During his tenure under my command, PO Angwang was an exemplary officer. He displayed a commitment to the community, his colleagues, and the City. He was able to make inroads into the Chinese community in Bayside—a community largely absent from standard precinct events and meetings. He was proactive in his crime prevention efforts. While in his position of crime prevention/community affairs, he (on his own) brought together Chinese restaurant owners and managers to educate them on robbery, theft, and burglary risks. He did and does continue to exude optimism and, prior to his arrest, he was popular among his colleagues and the borough.

78.     NYPD Deputy Inspector John Portalatin, who was later a Commanding Officer overseeing the 111th Precinct during Angwang's tenure, similarly wrote the following about Angwang on April 7, 2023 (also after his criminal case was dismissed):

> Since I [have] been his Commanding Officer, Police Officer Angwang was my Community Affairs Officer. He was hard working and dedicated to seeing the 111th Precinct improve relationships with the community. He has an excellent work ethic and had a great working relationship with the community. During the time we work[ed] together he never received a complaint from anyone in the community. The community love[d] the fact he made himself available for the community at all times of the day. I knew this accusation was false. I worked with him for a long time and during that time I knew he love[d] the United States of America. He was a former military soldier and he served our country in both the Marines and the Army. This is a man that dedicated over 10 years of service to our military branches and served an addition[al] 5 years in the New York Police Department.

**C. Angwang Attempts to Secure a Ten-Year Visa to Visit Family in Tibet**

79.     While serving his country, city, and community with bravery and distinction, Angwang desired to visit family in China.

80.     Travel to China required securing a visa from the Chinese Consulate.

81.     However, as is well-documented, obtaining a visa from the PRC as an ethnic

13

Tibetan is a notoriously difficult process.

82.    As an August 6, 2020, report from the U.S. Department of State reports:

> According to U.S. embassy and consulate contacts, as well as media reports, Tibetan-Americans, when applying for Chinese visas at PRC embassies, continued to undergo a strict screening process different from that of other U.S. citizens.  Tibetan-Americans reported more frequent harassment by security officials in Tibetan areas than in other parts of China.  Members of the Tibetan-American community reported they self-censored their behavior in the United States out of fear of retribution against their family members in Tibet or fear of losing future access to Tibet.  The U.S. government received several reports of instances in which Chinese authorities denied entry into China of Tibetan-Americans in 2019, despite these U.S. citizens possessing valid Chinese visas and travel documents.[3]

83.    Angwang knew full well the challenges in obtaining a visa as a Tibetan.

84.    In 2011, while serving in the Marine Corps, Angwang had applied for a visa to visit family in China but had his request denied; and in 2012, Angwang sought to visit China to see his mother, who was suffering from a serious illness.

85.    The visa application process was largely controlled in the first instance by relatively low-level employees working at the office of the Consulate General of China in New York, which is located in midtown Manhattan.

86.    Despite their relatively low-level administrative roles, these employees served as effective gatekeepers that could authorize final approval for entry visas, but they could refuse to pass on a visa application for any reason or no reason, which would preclude an applicant from gaining the visa.

87.    Because of the role that these employees had in visa applications, it was necessary for Angwang to develop respectful relationships with them in order to obtain a visa.

---

[3]    https://china.usembassy-china.org.cn/report-to-congress-on-access-to-tibetan-areas-of-the-peoples-republic-of-china-prc-sec-4-of-the-reciprocal-access-to-tibet-act-of-2018-pl-115-330-22usc-1182/#:~:text=According%20to%20U.S.%20embassy%20and%20consulate%20contacts%2C,U.S.%20(%20the%20United%20States%20)%20citizens.

88.     Beginning in 2012, Angwang had routine communications with one of these employees ("Employee-1") to secure a visa.

89.     In 2015, Angwang requested from Employee-1 a thirty-day visa to travel to China, and Employee-1 granted Angwang permission to travel for fourteen days; Angwang made the trip to China.

90.     In 2016, Angwang married his wife, and, in 2017, the couple had a daughter.

91.     After the birth of his daughter, Angwang wanted to again visit China with his family so that his daughter could meet his parents and his wife's grandparents.

92.     This time, Angwang sought a ten-year visa, which were issued routinely but often denied to ethnic Tibetans.

93.     As part of his effort to secure a longer-term visa, Angwang communicated with a separate low-ranking employee at the Chinese Consulate in New York, who, like Employee-1, served as an effective gatekeeper for Tibetans to obtain visas to travel to China ("Employee-2").

94.     Employee-2 was, like Angwang, from the Tibetan region.

95.     Angwang treated Employee-2 respectfully, and with certain deference, in an attempt to secure a ten-year visa.

96.     Angwang also advocated for other Tibetans obtaining visas, telling Employee-2, in sum and substance, that Chinese officials should not presume that Tibetans are political troublemakers.

97.     Angwang used his personal cell phone in communications with Employee-1 and Employee-2, consistent with the innocuous nature of the communications.

98.     In 2019, Angwang filled out an "addendum" to his 2014 SF-86C Form.

99.     On information and belief, Angwang was required to submit this addendum every

five years to retain his clearance.

100.    At the time, Angwang did not have copies of his previous applications.

101.    The 2019 addendum asked whether "[s]ince [his] last SF-86," he or any of his immediate family had any contact with a "foreign national" with whom he was "bound by affection, influence, common interest, or obligation" or with a "foreign government" and its agents.

102.    Angwang again answered "No" because, as with his previous SF-86 Form submissions, all of his contacts with foreign officials pertained to "routine visa application" or his travel to China.

103.    Angwang disclosed in the 2019 SF-86 addendum form, however, that he had traveled to China in 2012, Hong Kong in 2014, and China again in 2015, and that he had married his wife, a naturalized American citizen who was born in China.

104.    Because travel by ethnic Tibetans required a visa vetted by the Chinese Consulate, these responses effectively disclosed his contacts with officials at the Chinese Consulate.

105.    Although the SF-86 instructions contemplate an interview with a United States Government official, no United States Government official sought at any time to interview Angwang in connection with the forms submitted or to clarify any of his answers.

II.    **Based Entirely on His Innocuous Contacts with the Chinese Consulate Employees, the FBI and NYPD Pursue a Baseless and Discriminatory Criminal Case Against Angwang, Which is Ultimately Dismissed Due to a Lack of Evidence**

    A.    **The FBI and the NYPD Begin to Investigate Angwang Amidst the Federal Government's "China Initiative"**

106.    In or around 2017, the FBI and the Internal Affairs Bureau of the NYPD ("IAB") began investigating Angwang.

107.    On information and belief, the IAB was first notified by the FBI of a criminal

investigation involving Angwang and another officer on June 15, 2017.

108.    Although the FBI took the lead in the investigation, the NYPD and certain of its officers were heavily involved from the outset and throughout the investigation and proceedings.

109.    Indeed, the NYPD worked closely with, among others, the FBI's Counterintelligence Division "[f]rom the earliest stage of [the] investigation."[4]

110.    The NYPD cooperated with the FBI and provided information, including department cellphone records and Angwang's background check.

111.    For example, in or around June 2017, in connection with the FBI's investigation, NYPD Detective Squad Supervisor Duke Peter submitted an information request for Angwang's character assessment, personal cell phone number, whether he had a steady partner, and any family or relatives on the job.

112.    On November 7, 2017, also in connection with the FBI's investigation, Defendant Sparber conducted a background check of Angwang, and around that time provided the FBI with information and material related to Angwang, including personnel documents, a parking permit application, Angwang's work schedule, an audit of Angwang's searches in the NYPD's Domain Awareness System, and Angwang's military absence record.

113.    Defendant Sparber, along with Defendant Cutter, continually monitored the FBI's investigation and made attempts to confer with the assigned Special Agent at least through 2019.

114.    Indeed, Defendant Cutter later testified that he had multiple conversations with the FBI and federal prosecutors throughout the investigation.

115.    On information and belief, other NYPD employees—the Doe Defendants—heavily

---

[4] https://abc7ny.com/post/nypd-spying-baimadajie-angwang-tibetan-officer-arrested/10336665/

assisted in the initiation and continuation of the investigation and prosecution of Angwang.[5]

116.    At the time, Angwang was not notified of the investigation and has never been provided with any information as to its origin.

117.    Although Angwang subsequently came to learn that the investigation concerned his supposed operation as an "agent" for the Chinese government, there has never existed a shred of evidence that in any way suggests Angwang ever was such an unregistered "agent" of any kind.

118.    Angwang subsequently came to learn that federal investigators had intercepted certain of his communications with employees at the Chinese Consulate office.

119.    Specifically, after he was indicted, federal prosecutors provided information to the district court in connection with his federal prosecution, including that, "[t]he Federal Bureau of Investigation, via court-authorized electronic surveillance, intercepted numerous telephone calls and text messages between the defendant and PRC officials that revealed that the defendant received tasks from, and reported back to, PRC officials."

120.    Although Angwang does not know at present what exactly led to his coming under suspicion by the FBI or NYPD (*i.e.*, why they decided to intercept his communications with Employee-1 and Employee-2), Angwang's experience of being targeted by the Government as a Chinese individual in the United States was not unique during this period.

---

[5] Although Angwang knows that the NYPD was heavily involved in and instrumental to his investigation and prosecution, his knowledge of the full extent of the NYPD's involvement in his investigation is continuing to develop. Indeed, Angwang has been engaged in long-running litigation under the Freedom of Information Law to obtain information concerning the NYPD's involvement. *See Baimadajie Angwang v. The New York City Police Department*, No. 156737/2014 (Sup. Ct. N.Y. Cnty.).  To date, the NYPD has agreed to comply with its obligations to make a broad production of the documents relevant to the investigation into Angwang, but it has done so at an incredibly slow pace. What cannot be doubted is that Angwang has undertaken significant diligence to ascertain the role of the NYPD in his investigation, including the identities of the Doe Defendants.

121.    The federal Government had been dedicating significant attention and resources during the first Trump administration to its efforts to counter purported "Chinese national security threats."

122.    These efforts culminated and were exacerbated by the Department of Justice's formal launch in November 2018 of what was referred to as the "China Initiative."

123.    The China Initiative focused in particular on the prosecution of Chinese researchers and other academics but also formalized the Government's broad enforcement priorities, which included the aim of "combatting covert efforts [by China] to influence the American public and policymakers without proper transparency."

124.    The Department of Justice itself confirmed that Angwang's prosecution was part of the China Initiative.[6]

125.    Specifically, the Department of Justice identified Angwang's prosecution as a "China-Related Case[] Example[]" of the China Initiative.[7]

126.    In 2022, the Department of Justice ended the China Initiative, amidst criticisms from civil rights groups that it racially profiled Asian-Americans.

127.    Matthew Olsen, then Assistant Attorney General and head of the National Security Division, conceded in a speech on February 23, 2022: "I have concluded that [the China] initiative is not the right approach."

128.    Indeed, most of the prosecutions related to the China Initiative lacked merit.

129.    In December 2021, Massachusetts Institute of Technology conducted a review of 77 cases brought against 150 defendants during the China Initiative's lifespan, which found that

---

[6]    https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related

[7] *Id.*

75% of those cases had not resulted in a conviction.[8]

130.    This is in stark contrast with the Department of Justice's general conviction rate, which is that *less than 10%* of federal criminal cases result in no conviction.[9]

131.    By 2024, the Congressional Asian Pacific America Caucus ("CAPAC") issued a press release that made clear: "In over three years of investigations, over 150 defendants, and at least 77 cases, the China Initiative secured just one single conviction in a court of law."[10]

132.    The CAPAC press release also noted that its members had previously met with DOJ and FBI officials "to express concerns about the program, including its use of racial profiling and the resulting harms it caused the Asian American community."

133.    As Congressman Ted Lieu put it:

> Discriminatory targeting of Asian Americans is sadly not new. Despite countless contributions to our country's history and culture, Asian Americans are still sometimes subject to the racist "perpetual foreigner" myth. The China Initiative was a shameful iteration of that kind of problematic thinking.[11]

134.    Congresswoman Pramila Jayapal commented that "The Trump administration's 'China Initiative' was a racist stunt that did little to protect America's national security interests and singled-out Chinese Americans for discrimination solely because of their ethnicity."[12]

**B.    FBI Agents Compile a Knowingly False Criminal Affidavit Rife with Baseless Allegations Based on Mistranslations and Falsified Evidence**

135.    In connection with this investigation, FBI Special Agent Stephen Deck drafted a federal criminal "Complaint and Affidavit in Support of Arrest Warrant" (the "Deck Complaint"),

---

[8] https://technical.ly/civics/doj-china-initiative-revival/

[9] https://bjs.ojp.gov/document/fjs22.pdf

[10] https://capac.house.gov/press-release/capac-members-applaud-second-anniversary-termination-china-initiative

[11] *Id.*

[12] *Id.*

which included a series of supposed factual allegations that were "the source of [his] information and the grounds for his[] belief."

136.    The Deck Complaint revealed the only (supposed) evidence Angwang has ever seen suggesting any merit to the Government's allegations that he acted as a foreign agent or lied on his SF-86 Form.

137.    The Deck Complaint, however, is a truly extraordinary and lawless document.

138.    The sole evidence on which Special Agent Deck relied in compiling the Deck Complaint was intercepted phone calls and text messages in Mandarin between Angwang and Employee-1 and intercepted phone calls and text messages in Mandarin between Angwang and Employee-2.

139.    The Complaint stated that from August 21, 2014, through August 11, 2017, Angwang "called and texted PRC Official-1's cellular telephone on at least 53 occasions" and, from June 2018 through March 2020 "called and texted PRC Official-2's cellular telephone on at least 55 occasions."

140.    Despite having supposedly intercepted 53 communications between Angwang and Employee-1, however, the Complaint makes no allegation that Angwang was acting as a foreign agent under Employee-1's direction and control.

141.    Rather, the Deck Complaint relies entirely on communications between Angwang and *Employee-2* and alleges that Angwang was acting as a foreign agent acting under the direction and control of Employee-2.

142.    The allegation in the Deck Complaint that Angwang was acting under the direction and control of Employee-2 was false.

143.    The allegation in the Deck Complaint that Angwang was acting under the direction

and control of Employee-2 is not remotely supported by any of the supposed evidence on which the Deck Complaint relies (and is not supported by anything).

144.    Indeed, as explained below and consistent with the foregoing, the nature of these communications was entirely innocuous and standard for ethnic Tibetans seeking to navigate the difficult administrative process of securing any visa from the Chinese consular's office.

145.    As a general matter, the false statements in the Deck Complaint can be construed into two general categories: (i) scurrilous allegations about the contents of the communications between Angwang and Employee-2 that Special Agent Deck appears to have simply invented out of whole cloth; and (ii) allegations that rely on indefensibly incorrect translations from Mandarin to English that make wholly innocuous statements sound inculpatory.

146.    The following is a non-exhaustive chart identifying the allegations in the Deck Complaint that are totally invented and false.

| **Allegation in Deck Complaint** | **Truth** |
|---|---|
| The Deck Complaint alleges that Angwang proposed that Employee-2 visit a new Tibetan community center in Queens, and that Special Agent Deck "believe[d] that the purpose of a proposed visit to the community center was twofold: (1) ANGWANG was advising PRC Official-2 to visit the community center in order to maintain visibility on the activities of ethnic Tibetans in the New York area; and (2) ANGWANG was advising PRC Official-2 that visiting the community center would assist in spotting and assessing potential intelligence recruits or sources within the Tibetan community." Deck. Compl. ¶ 14. | This allegation is totally false. Angwang never stated or suggested that he and Employee-2 should visit a community center to assist in spotting and assessing potential intelligence recruits or sources. Indeed, the Tibetan community center was a matter of public knowledge. |
| The Deck Complaint alleges that Angwang "offered that his position within the NYPD was valuable to the PRC because ANGWANG could provide NYPD information to the Consulate." Deck. Compl. ¶ 15. | This allegation is totally false. Angwang made no such statement (nor does the Deck Complaint quote or cite any portion of the recorded communications suggesting as such). |

| | |
|---|---|
| The Deck Complaint alleges that on or about November 19, 2018, Angwang asked Employee-2 if he wanted to attend an NYPD event, and that when Employee-2 stated that he could not attend official NYPD events, Angwang acknowledged "the sensitivity of a diplomat's position." <br><br> Special Agent Deck summarized this supposed exchange by alleging that, "[i]n other words, ANGWANG informed PRC Official-2 that ANGWANG could provide nonpublic information regarding the internal operations of the NYPD." Deck. Compl. ¶ 15. | These allegations are totally false. The "event" in question was not an NYPD event, but an unofficial event run by the non-profit NYPD Asian Officer Fraternity called the Asian Jade Society Dinner. This was an event *open to the public* and attended by more than 1,600 people, including foreign dignitaries, ambassadors, and high-ranking officials of the Chinese consulate and other foreign consulates. <br><br> Angwang made no statement to Employee-2 suggesting in any way that Employee-2's attendance at this event could somehow give him access to "nonpublic information regarding the internal operations of the NYPD." |
| The Deck Complaint alleges that Angwang "talked about the importance of intelligence assets." Deck. Compl. ¶ 16. | This allegation is totally false. Special Agent Deck invented this content. Angwang never used a term meaning "intelligence asset" or "intelligence source" or anything similar to those terms. |
| The Deck Complaint alleges Angwang "indicated that he himself was a PRC asset." Deck. Compl. ¶ 18. | This allegation is totally false. Angwang never stated, suggested, or indicated in any way that he was a "PRC asset." |
| The Deck Complaint alleges that Angwang called Employee-2 and "assessed" that a U.S. citizen of Tibetan ethnicity who had run for political office "would make a good intelligence source." Deck. Compl. ¶ 19. | This allegation is totally false. The Deck Complaint fails to quote Angwang stating or suggesting anything about the former political candidate's service as an intelligence source (because Angwang never said such a thing). <br><br> The political candidate's campaign in Ohio was well-known public news and the candidate, Aftab Pureval, is the current mayor of Cincinnati, Ohio. Angwang introduced the topic of Mr. Pureval to suggest that ethnic Tibetans in the United States could be successful to disprove PRC stereotypes about them. |

| | |
|---|---|
| The Deck Complaint alleges that Angwang told Employee 2 "that he wanted to bring glory to the PRC" by passing an exam needed for an NYPD promotion. Deck Compl. ¶ 20. | This allegation is totally false and contradicted by the Complaint. In truth, Angwang stated that he wanted to "bring glory to the **Chinese**," *i.e.*, to the Chinese community—not the PRC—by demonstrating that ethnic Tibetans could succeed in the United States. Deck Compl. ¶ 20. |
| The Deck Complaint alleges that, after Employee-2 told Angwang that he would not get a 10-year visa and could only get a 30-day visa, Angwang "suggested that issuing ten-year visas to Tibetans in the United States might assist their recruitment as intelligence assets," that "he should receive preferential treatment because he is assisting the Consulate with intelligence gathering," and that "individuals who conduct intelligence gathering for the Consulate should be rewarded with ten-year visas as incentive[s] for continued intelligence gathering activities." Deck. Compl. ¶¶ 21-22. | This allegation is totally false. Angwang never stated or suggested that he or others could serve as PRC intelligence assets or sources and the Deck Complaint notably does not quote Angwang saying as much. |
| The Deck Complaint alleges that, after Angwang secured a promotion from the NYPD in being assigned to a Community Liaison Unit, that Angwang told Employee-2 that his "goal in doing this [getting the promotion] is to create more opportunities for the people after me." <br><br> The Deck Complaint construes this innocuous statement to mean that Employee-2 "appears to have inferred that ANGWANG, in his new role as a community liaison, would have more access to potential intelligence sources in the future." Deck. Compl. ¶ 23. | This allegation is totally false. Angwang never referred to himself or others as serving as intelligence assets or sources for the PRC. |

147.    The following is a non-exhaustive chart identifying the allegations in the Deck Complaint that rely on egregious mistranslations:

| **Allegation in Deck Complaint** | **Truth** |
|---|---|
| The Deck Complaint alleges that Angwang "regularly refer[red] to [Employee-2] as 'Boss.'" Deck Compl. ¶ 11. | This is an obvious translation error.  The correct translation of the term at issue is not "boss," but "elder brother," which is a standard term of respect in Mandarin that in no way reflects a principal-agent relationship. |
| The Deck Complaint alleges that Angwang told Employee 2, "let them know, you have recruited one in the police department."  Deck Compl. ¶ 15. | This is an obvious translation error.  The correct translation of Angwang's statement to Employee-2 is "[y]ou have someone who is a friend in the police department."  Angwang said nothing suggesting that he was Employee-2's (or the PRC's) "recruit." |
| The Deck Complaint alleges that Angwang "asked PRC Official-2 about his development of sources and the need to 'develop' Catholics, Muslims or those of Hui ethnicity in the Tibetan community," that Angwang "suggested that PRC Official-2 develop this group of people [the Tibetan group Bujie Xiongdan] as intelligence sources within the Tibetan community in New York," Deck Compl. ¶ 16. | This is an obvious translation error.  Angwang did not use a Mandarin term that would translate to "develop."  The more accurate translation is to "make friends," and Angwang's statement was plainly an innocuous one stating that it would be mutually beneficial if the Chinese Consulate granted ten-year visas to the diverse Tibetan community.  As Angwang made clear to Employee-2, non-Buddhist Tibetans are "a group that has been discriminated against and neglected in the Tibetan community." |
| The Deck Complaint alleges that Angwang "also talked about the importance of Tibetan intelligence assets seeking out PRC Official-2, rather than PRC Official-2 seeking out the assets, stating 'we'll do a reverse direction development.'" Deck Compl. ¶ 16. | This is an obvious translation error.  Angwang did not state anything about a "reverse direction development," but instead that the Consulate should "reverse its thinking" about Tibetans and not assume that they are troublemakers. |
| The Deck Complaint alleges that Angwang stated that the "Consulate 'should be happy instead . . . because you have extended your reach into the police department," and that he | This is an obvious translation error. The translation to "extended your reach" is false and the closer approximation is "developed a |

| | |
|---|---|
| should "at least let them know, hey, you have someone in the police department."  Deck Compl. ¶ 18. | connection." |
| The Deck Complaint alleges that Angwang told Employee-2 that granting ten-year visas to ethnic Tibetans would lead them to become "enthusiastic." Deck Compl. ¶¶ 21-22. | This translation is fundamentally misleading. The closer approximate of what Angwang actually said is that Tibetans in the United States would feel more "positive" about gaining ten-year visas that are routinely granted to all other individuals. |

148.    Without these mistranslations and false statements, there would have been no basis for finding probable cause that Angwang was acting at the "direction or control" of PRC officials, 18 U.S.C. § 951(d), as required for Count One of the Indictment against Angwang.

149.    As to Counts Two, Three, and Four of the Indictment (all relating to Angwang's supposedly knowing and willful false statements in the SF-86 addendum he submitted in 2019), the Deck Complaint is equally deficient.

150.    The Deck Complaint claimed that Angwang falsely answered "No" to two questions, which asked, in relevant part:

> Since your last SF-86, have you or any member of your immediate family had any contact with a foreign government, its establishment (such as an embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the U.S.?

> Since your last SF-86, do you have, or have you had, close and/or continuing contact with a foreign national with whom you, your spouse, cohabitant, are bound by affection, influence, common interests, or obligations?

151.    Special Agent Deck accused Angwang of making a false statement by answering those questions in the negative, but there was no basis to conclude that those statements were false, let alone knowingly and willfully so.

152.    For one, Special Agent Deck knew that SF-86 Forms had included instructions

providing that an applicant should report "No" if any such contacts were for routine visa or travel arrangements, as these were (and as Special Agent Deck knew).

153.    Further, Angwang disclosed in the 2019 SF-86 Form that he had travelled to China since filling out the 2014 SF-86 Form, which necessarily meant that he had contact with the Chinese consulate to secure a visa.

154.    To be clear, Special Agent Deck's accusation that Angwang made a false statement in his SF-86 by failing to disclose his contacts with Employee-1 and Employee-2 necessarily depended on the false premise that Angwang's contacts with those two individuals was not for routine visa arrangements (and was instead part of his spying for the Chinese government).

155.    But Special Agent Deck knew that Angwang's contacts with those two individuals was for routine visa arrangements, and thus he knew there was no basis to conclude Angwang had made an unlawful false statement (and thus no probable cause that he had done so).

156.    Nevertheless, on September 19, 2020, Special Agent Deck filed the Deck Complaint in the United States District Court for the Eastern District of New York.

157.    In the Deck Complaint, as described above, Special Agent Deck knowingly or intentionally, or with reckless disregard for the truth, made false statements and, on information and belief, omitted material information that would have disclosed the innocuous nature of Angwang's interactions with Employee-1 and Employee-2 and thus fatally undermined a probable cause finding as to all four counts in the complaint.

158.    The result was a charging instrument falsely alleging that Angwang was working as an unauthorized "agent of a foreign government" and knowingly and willfully made false statements in a security clearance form.

159.    United States Magistrate Judge Ramon E. Reyes, Jr., signed the arrest warrant on

September 19, 2020 based on the false contents in the Deck Complaint.

160.    But for the false and misleading statements and omissions in the Deck Complaint, there would not have been probable cause for Magistrate Judge Reyes to have issued the warrant and he would not have done so.

### C. On the Basis of the False Deck Complaint, Angwang is Arrested at Gun Point in Front of His Family, Detained Under Exceptionally Inhumane Conditions, and Indicted

161.    On September 21, 2020, Angwang was arrested at home in front of his wife and two-year-old daughter.

162.    During his arrest, multiple SWAT team members pointed M4 rifles to Angwang's face in front of his family.

163.    Following his arrest, the NYPD went on a nationwide press junket, led by Mr. Shea, then the Commissioner and highest-ranking officer of the NYPD.

164.    For example, on September 25, 2020, Mr. Shea sat for an interview with Maria Bartiromo that aired nationally on Fox Business in which he boasted about Angwang's arrest.

165.    Among other things, Mr. Shea stated (falsely) that Angwang "violated every oath he took in this country" and had committed a "betrayal of trust at the highest level" and that he was a "real threat."

166.    Mr. Shea said that he was glad that Angwang would be "brought to justice."

167.    For its part, the U.S. Department of Justice issued a lengthy press release about Angwang's arrest, which included several statements from various federal officials telling false statements about Angwang and his conduct.[13]

---

[13]    https://www.justice.gov/usao-edny/pr/new-york-city-police-department-officer-charged-acting-illegal-agent-people-s-republic

168.    On October 1, 2020, Angwang filed a bail application moving for pretrial release.

169.    On October 2, 2020, United States Magistrate Judge Lois Bloom granted Angwang's bail application.

170.    However, the Government appealed Magistrate Judge Bloom's decision and, on October 7, 2020, United States District Court Judge Eric Komitee reversed the bail decision.

171.    But for the false and misleading statements and omissions in the Deck Complaint, there would not have been a basis for Judge Komitee to deny Angwang's bail application and he would not have done so.

172.    On October 13, 2020, the grand jury returned a four-count Indictment against Angwang, charging him with acting as an agent of a foreign government in violation of 18 U.S.C. § 951; wire fraud in violation of 18 U.S.C. § 1343; making false statements in violation of 18 U.S.C. § 1001; and obstructing an official proceeding in violation of 18 U.S.C. § 1512.

173.    On information and belief, the evidence presented to the grand jury consisted almost exclusively of the same set of false allegations contained in the Deck Complaint, including but not limited to the mistranslations of Mandarin and the false and baseless representations that Angwang offered his services as a PRC agent and disclosed possible information sources.

174.    On information and belief, on top of providing affirmatively false evidence to the grand jury, United States' officers knowingly withheld exculpatory evidence from the grand jury.

175.    On information and belief, the arrest of Angwang, the search of his property, and all subsequent investigations failed to reveal any incriminating evidence that would supplement the Deck Complaint.

176.    Angwang was detained at the Metropolitan Detention Center ("MDC") in Brooklyn from September 21, 2020, to February 16, 2021, a period of about five months.

29

177.    While detained at the MDC, Angwang was subject to prolonged periods of solitary confinement because of COVID-19 quarantine procedures and a purported effort to shield him from anti-police sentiment.

178.    The conditions of imprisonment were abysmal.

179.    Food was passed to him through a box in the middle of the door.

180.    During the winter months he was there, Angwang's unit was without adequate heat for five days, causing the temperature to fall below 50 degrees in cells.

181.    There was a shortage of blankets, and MDC policy prohibited inmates' families from ordering them blankets.

182.    And during that same period, anti-Asian animus and harassment in the United States was surging, with many referring to COVID-19 as the "China Virus."[14]

183.    Advocates expressed concern and fear that the federal government was indifferent or even supportive of such racist animus.[15]

184.    As of February 2, 2021, Angwang had spent 75 days in "lock down," meaning that he was confined in his cell for 24 hours per day.

185.    For another 47 days, Angwang was subject to "partial lockdown," meaning that he was permitted two hours per day outside of his cell.

186.    In February 2021, Angwang began experiencing the classic symptoms of COVID-19, and he fell ill with the virus while detained.

187.    As a result of having contracted COVID-19, Angwang was moved into an isolation unit.

---

[14]    *See, e.g.*, https://www.nytimes.com/2020/07/21/business/media/asian-american-harassment-ad-council.html; https://www.nytimes.com/2021/03/18/us/politics/asian-politicians-racism.html.

[15] *Id.*

188.    Detention at the MDC also precluded Angwang from seeing his family except for on one occasion.

189.    Angwang was only permitted extremely limited contact with his defense attorney.

190.    All told, Angwang served five months in solitary confinement.

191.    On February 16, 2021, the district court finally ordered Angwang released from pretrial detention on a $2 million bond.

192.    Angwang was placed on home detention for approximately two years, from February 16, 2021, to January 19, 2023.

193.    When Angwang was initially arrested, he was suspended by the NYPD without pay for thirty days.

194.    Additionally, because of an administrative error, Angwang received no salary from the NYPD for several months following his arrest.

195.    Even once released, Angwang was unable to perform overtime work for the NYPD, depriving him of additional income.

196.    Angwang was not permitted to leave the Eastern District of New York.

197.    Law enforcement removed Angwang's NYPD-issued firearm from him, leaving Angwang feeling unsafe and vulnerable to retaliation from people he had arrested as an NYPD officer.

198.    Meanwhile, in January 2021, Angwang received a less than honorable discharge from the Army Reserves because of the false criminal charges levied against him.

199.    On May 17, 2021, while the false criminal changes were pending, Angwang was served with internal NYPD charges and specifications ("Charges and Specifications").

200.    Charges and Specifications are internal NYPD employment-based charges that

concern the conduct of NYPD officers.

201.    The NYPD's Charges and Specifications mirrored precisely the same four federal charges contained in Angwang's indictment (*i.e.*, working as a foreign agent for China and providing false statements on the 2019 SF-86).

202.    Defendant Cutter signed the Charges and Specifications.

**D. Nearly Three Years After He Is Arrested, the Government Abruptly Moves to Dismiss the Criminal Case Against Angwang in the Interests of Justice and Due to a Lack of Evidence**

203.    On January 13, 2023, the Government abruptly filed a motion to dismiss the indictment against Angwang.

204.    The Government stated in its motion that it "obtained additional information bearing on the charges.  Having assessed the evidence as a whole in light of that information, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the government hereby moves, in the interest of justice, to dismiss the indictment without prejudice."

205.    No other explanation was provided for the Government's about-face.

206.    On January 19, 2023, the district court granted the Government's motion and dismissed the charges against Angwang without prejudice.

207.    At the dismissal conference, the court noted that "the government's letter that refers I would say fairly obliquely to the fact that new evidence came into your possession as a consequence of further investigation. That's all understood and well taken."

208.    The Government responded: "The decision to file this motion was based upon an assessment of all the evidence and information that is now available to the government including information developed subsequent to charges and it's based on an assessment of all of that information holistically that the government has determined that it's appropriate to seek dismissal in the interest of justice."

209.    The court concluded: "[I]t's unfortunate, obviously, that Mr. Angwang did serve as much time as he did in jail pretrial or in detention pretrial but better late as they say than never."

210.    Defendant Cutter was in court for the proceedings.

## III.    After His Exoneration, Angwang Speaks Publicly and Announces Legal Claims

211.    On January 24, 2023, just five days after the dismissal of his criminal charges, Angwang told the press:

> For the horrible things they have done to me and my family, my friends, my reputation, my career, they are not going to change my love and respect for Americans and America. . . . So, my question is, is it racially motivated? Is it abusing power? . . .  Those are the questions I think they should answer.

212.    On February 2, 2023, in an article published by *CBS News*, Angwang was quoted as saying that "[s]ince the beginning, I knew it was baseless, manufactured accusations."[16]

213.    The *CBS News* article reported, "Angwang believes he was a victim of overzealous prosecutors and anti-Asian prejudice."

214.    On February 9, 2023, the Associated Press aired a videotaped interview with Angwang in which he stated:

> Why did you start the investigation on me?  Why did you drop all the charges?  We want to know.  You can't just go after an American citizen, ruin his life, put him in jail [for] six months, frame him as a spy.  All these damages—we can never go back, we want the answer, too.  Why did you start?  Why did you end it?  We want an explanation.  And we're demanding that.[17]

215.    On April 15, 2023, Angwang filed a Notice of Claim with the City of New York pursuant to Section 50-e of the New York General Municipal Law.

216.    A Notice of Claim is a document you file with city agencies announcing your intent

---

[16] https://www.cbsnews.com/newyork/news/baimadajie-angwang-nypd-officer-china-spy-exclusive-interview/

[17] https://www.youtube.com/watch?v=1bqhom45RZA

to file a lawsuit against the City.

217.    The Notice of Claim stated that Angwang was arrested without cause and wrongfully detained and charged with crimes he did not commit.

218.    The Notice of Claim announced Angwang's intent to pursue legal claims for false arrest, wrongful imprisonment, violation of special duty, malicious prosecution, intentional and negligent infliction of emotional distress, defamation, violation of civil and constitutional rights, negligence, and reckless acts causing loss of freedom and pain and suffering.

## IV.    Despite the Dismissal of All Criminal Charges, the NYPD Vindictively and in Retaliation Pursues Baseless Employment Charges Against Angwang and Fires Him

### A.    The NYPD Pivots and Pursues Administrative Claims Against Angwang Due to His Supposed Failure to Appear at a Hearing

219.    As noted above, in 2021, the NYPD instituted internal administrative "Charges and Specifications" against Angwang that mirrored exactly the four charges levied against him in his federal criminal case.

220.    The NYPD had effectively stayed its pursuit of those charges, however, pending the federal criminal proceedings.

221.    And throughout the pendency of those federal criminal charges, Angwang remained suspended from his NYPD duties.

222.    While he was suspended, Angwang and other suspended officers were required to report every weekday to the IAB headquarters at 315 Hudson Street in Manhattan.

223.    Throughout the period of his suspension, there were four other suspended officers who also regularly reported to IAB headquarters.

224.    On information and belief, none of the four other officers were of Chinese national origin or Tibetan ethnicity.

225.    The IAB would take attendance at around noon, and suspended officers would leave

34

at around 12:30.

226.    However, Defendant Cutter, who supervised these suspended officers, treated Angwang differently than the other officers.

227.    For example, Defendant Cutter often made Angwang stay in the building later than the other suspended officers.

228.    Moreover, Defendant Cutter denied Angwang's requests to take periods of vacation longer than a day or two, despite Angwang having accrued more than 100 vacation days.

229.    On information and belief, Defendant Cutter did not deny similar vacation requests from the other suspended officers.

230.    Angwang was the only suspended officer who had to ask repeatedly to use his accrued vacation days.

231.    Despite the dismissal of the federal criminal case against Angwang for lack of evidence on January 19, 2023, the NYPD notified Angwang in May 2023 that it was nevertheless pursuing its Charges and Specifications against him for the same exact conduct.

232.    For the avoidance of doubt, the NYPD and its employees knew that there was no evidence to support the false criminal allegations against Angwang and that were the basis of the Charges and Specifications.

233.    Indeed, Defendant Cutter—who was primarily responsible for pursuing the Charges and Specifications against Angwang—later testified that he had multiple conversations with the FBI and federal prosecutors and would thus have been well aware that there was no evidence to sustain the pending charges.

234.    On information and belief, the NYPD could have dismissed the Charges and Specifications against Angwang at any point (and should have, especially after the dismissal of

the federal criminal charges).

235. Nevertheless, again despite the dismissal of the federal criminal case, the NYPD pursued its Charges and Specifications against Angwang that alleged the exact same conduct underlying the then-dismissed federal criminal case.

236. Specifically, on May 17, 2023, about a month after Angwang filed his Notice of Claim against the City of New York, Angwang was notified that the IAB had scheduled an administrative interrogation hearing pursuant to Administrative Guide 318-11, sometimes called a "GO-15 interrogation," to take place five days later, on May 22, 2023.

237. GO-15 interrogations consist of questioning an NYPD officer concerning administrative charges they are facing.

238. GO-15 interrogations generally last several hours.

239. NYPD service members who are the subject of GO-15 interrogations are generally entitled to a reasonable period of time to obtain and confer with counsel prior to questioning.

240. The NYPD's Administrative Guide contemplates that "a reasonable period of time" is an investigation-specific determination.

241. In this case, Defendant Cutter stated to Angwang's counsel that he was planning to ask Angwang questions about the conduct underpinning the dismissed criminal charges.

242. Although Angwang was not per se opposed to testifying and certainly had nothing to hide, the criminal charges were dismissed *without prejudice* and questioning of Angwang about allegedly criminal conduct therefore necessarily raised Fifth Amendment concerns, making the need for able and prepared counsel even more important.

243. Nevertheless, Angwang later learned that Defendant Cutter had planned to pose about *1,700* questions to Angwang during the GO-15 interrogation.

244.    Further, Angwang was informed that Defendant Cutter intended to question Angwang at the GO-15 interrogation for over *five days*, despite GO-15 interrogations typically lasting just several hours.

245.    Defendant Cutter later testified that he had discretion as to when to order a GO-15 interrogation.

246.    Despite there being no basis for the charges, Defendant Cutter later testified that "[t]here were so many questions that needed to be asked of Officer Angwang."

247.    On information and belief, the decision to subject Angwang to 1,700 questions and five days of interrogation about alleged criminal conduct was not just abusive, it was inconsistent with the NYPD's treatment of other officers subject to GO-15 interrogations.

248.    Angwang was provided with no meaningful discovery in advance of the interrogation.

249.    In the interim, Angwang retained new counsel to represent him in the GO-15 interrogation and beyond.

250.    On May 31, 2023, Angwang's new counsel sent a letter to Defendant Cutter requesting a brief adjournment of the hearing, an agreement to limit the GO-15 interrogation to one 4-hour session, and the production of the materials in advance that they wanted to question Angwang about.

251.    Specifically, counsel wrote as follows:

> First, we request a five-week adjournment of the interrogation to afford our office time to get up to speed on the matter. Second, we understand the NYPD has expressed its intention to interrogate Mr. Angwang for five full days, which seems not only unwarranted and unduly invasive, but also wholly inconsistent with the NYPD's general practice of questioning similarly-situated individuals for a matter of hours. We request that the NYPD afford Mr. Angwang the same treatment as others subjected to the same process, and limit its interrogation of Mr. Angwang to 4 hours. To the

extent the NYPD reasonably and in good faith believes it needs more time than that, we are open to further discussion as to the length of the inquiry. Third, we understand the NYPD intends to question Mr. Angwang on the record about a large number of documents currently in the NYPD's possession without first affording Mr. Angwang the ability to even view those documents before the proceeding. We request that the NYPD provide us the documents in advance of the proceeding to allow Mr. Angwang to familiarize himself with them so that he can intelligently answer questions about their contents.

252.    On June 1, 2023, counsel for Angwang spoke with Defendant Ricciardi about the requests made in the May 31st letter.

253.    Defendant Ricciardi categorically refused to accommodate each request in their entirety.

254.    Counsel pressed Defendant Ricciardi that five full days of questioning is an unprecedented, extreme, and abusive length for a GO-15 interrogation.

255.    Defendant Ricciardi seemed to acknowledge certain of the foregoing but characterized the case as "unique," without offering any details as to what made it unique.

256.    Defendant Ricciardi was unable to conjure up any precedent for any other GO-15 interrogation involving anything close to five days of interrogation.

257.    On June 2, 2023, counsel for Angwang informed Defendant Cutter by letter that the onerous GO-15 interrogation proposed by the NYPD was part of "a long pattern of abusive and discriminatory treatment of Mr. Angwang" and "part and parcel of a discriminatory campaign against him based on his race and national origin."

258.    Counsel noted that, "[i]n light of the foregoing, Mr. Angwang has no choice but to not participate in the scheduled GO-15 interrogation that is set to take place on Monday.  Should the NYPD reconsider its position and offer Mr. Angwang even a modicum of fairness in connection with the proceedings, he would consider participating in the future.  As it stands,

however, he will not do so."

259.    Counsel made clear, however, that Angwang was not refusing to participate in perpetuity: "Mr. Angwang has no fear of answering any questions the NYPD might have, has had every intention to participate in the NYPD's process in good-faith, and would be eager to further clear his name."

260.    Without offering justification, the NYPD refused to grant Angwang the adjournment or any of the requests in his counsel's May 31st or June 2nd letters.

261.    On June 5, 2023, Angwang showed up at 315 Hudson Street and reported to the location where he had been serving his suspension; he did not report to the location where the GO-15 interrogation was to be conducted.

262.    The NYPD did not contact Angwang that day about the hearing, despite NYPD procedure requiring the department to contact an officer by phone when they believe he failed to appear for a GO-15 interrogation.

263.    The NYPD subsequently claimed that Angwang had refused its order to appear at the GO-15 interrogation, even though Angwang's counsel had made clear that Angwang was willing to be questioned but needed a brief adjournment so that counsel could familiarize themselves with the voluminous discovery and weighty concerns at issue.

264.    Specifically, that same day, on June 5, 2023, the NYPD issued new Charges and Specifications against Angwang, this time alleging that Angwang had failed to comply with a lawful order and failed to appear at an Official Department Interrogation.

265.    On June 8, 2023, Defendant Cutter issued a Notice reporting the suspension of Angwang due to the new Charges and Specifications concerning the GO-15 interrogation.

266.    In that report, Defendant Cutter gratuitously referred to Angwang as a "male

Asian," despite Defendant Cutter's acknowledgment that the charges against Angwang did not "have anything to do with the fact that Officer Angwang is an Asian male."

267.    Indeed, when attempting to defend the gratuitous inclusion of Angwang's racial identity in the suspension notice (*i.e.*, that Angwang is Asian), Defendant Cutter testified that he included it because he had relied on a "template that's utilized when members are suspended, and part of that information includes the statement regarding sex and nationality."

268.    But that testimony makes no sense in (at least) two separate ways and instead reflects Defendant Cutter's racial animus.

269.    *First*, Defendant Cutter included Angwang's *race* (Asian) in the suspension notice, *not* his nationality.

270.    *Second*, and more troublingly, Angwang's *nationality* is *American*—as alleged above, he is a U.S. citizen.[18]

271.    Defendant Cutter's twin beliefs that (i) Angwang's status as an "Asian" was apparently relevant to his discipline, and (ii) Angwang's *nationality* was anything other than American, reflects his deep-seated racial animus against Angwang.

272.    Shortly thereafter, in June 2023, Angwang was again suspended without pay.

**B.  After an Internal Trial, NYPD Commissioner Caban Imposes Unduly Harsh Discipline and Orders Angwang's Dismissal from the NYPD**

273.    A one-day internal administrative trial for the new Charges and Specifications regarding the GO-15 interrogation was scheduled for September 26, 2023.

274.    In advance, counsel for Angwang submitted extensive documentation of

---

[18] All available sources make clear that nationality is about *lawful* status and *not* place of birth and Defendant Cutter undoubtedly knew that.  For example, the NYPD Patrol Guide itself reflects in several instances that "Nationality" and "place of birth" are different and that one is only a "foreign national" if they are "not a citizen of the United States." https://www.nyc.gov/html/nypd/downloads/pdf/public_information/public-pguide2.pdf

Angwang's service to his country, community, and the NYPD.

275.    The trial was held before Assistant Deputy Commissioner of Trials Vanessa Facio-Lince.

276.    Defendant Cutter was the key and principal witness for the NYPD.

277.    In sum and substance, Defendant Cutter testified that after the federal criminal charges were dismissed, he created around 1,700 questions that "needed to be asked of Officer Angwang."

278.    Defendant Cutter further claimed that Angwang failed to show up for the scheduled GO-15 interrogation.

279.    During her direct examination of Defendant Cutter, NYPD Department Advocate Penny Bluford-Garrett referred to Angwang by a different, stereotypically Asian name, "Wang."

280.    Angwang testified on his own behalf and called retired NYPD sergeant Jessica Michel and Deputy Inspector John Hall as character witnesses.

281.    Angwang's principal arguments at the administrative trial were that (i) Angwang did not violate a *lawful* order because the order to appear at the GO-15 interrogation was unlawful pursuant to the NYPD's own rules and precedents (principally, Administrative Guide 318-11), as well as constitutional principles of due process and fairness; and (ii) in any event, if Angwang were to be found guilty, his punishment should only be a brief suspension, as is outlined in the NYPD's own materials and is consistent with NYPD precedent for similar violations and for first-time offenders.

282.    On November 21, 2023, Commissioner Facio-Lince rejected those arguments and issued a report and recommendation that would find Angwang guilty of the Charges and Specifications and recommended a drastic penalty of forced separation from the NYPD.

283.    Commissioner Facio-Lince ordered forced separation as a penalty even though she acknowledged that the presumptive penalty for failure to comply with a lawful order is 20 penalty days, and the aggravated penalty is 30 days.

284.    Commissioner Facio-Lince also acknowledged Angwang's distinguished record of service.

285.    Despite Commissioner Facio-Lince's strict recommended punishment, however, she also recommended "immediate post-trial settlement negotiation" for Angwang's exit from the department, which would have allowed Angwang to file for vested-interest retirement.

286.    On January 29, 2024, however, Defendant Caban overruled Deputy Commissioner Facio-Lince's penalty recommendation and imposed a punishment that was even stricter: immediate dismissal from the NYPD.

287.    That immediate dismissal meant that Angwang necessarily forfeited his vested retirement benefits.

288.    Defendant Caban's decision to impose a harsher form of discipline than that recommended by the Trial Commissioner is extremely unusual and inconsistent with standard practice.

289.    According to the publicly available NYPD Police Trial Database, on only one other occasion has the NYPD Commissioner imposed harsher discipline than the Trial Commissioner's recommendation.

290.    Defendant Caban's treatment of Angwang is inconsistent with that of similarly situated comparators who do not share Angwang's racial and ethnic identity or those who spoke out on matters of public concern.

291.    For example, in Case No. 2014-11309, former NYPD Commissioner William

Joseph Bratton ordered NYPD Detective Michael Fantroy's vested interest retirement separation, over the Trial Commissioner's recommendation of dismissal.

292.    On information and belief, Detective Fantroy is not Chinese/Tibetan/Asian-American and did not engage in protected activity.

## V.    **The Horrific Damage Caused by Defendants**

293.    As a result of Defendants' unlawful actions, Angwang has suffered enormous damages, in the form of economic damages, loss of liberty, pain and suffering, emotional distress, and reputational harm.

294.    Angwang was forced to suffer a loss of liberty while he was detained, economic damages from not being able to work, and emotional distress from, among other things, being separated from his family, being detained in solitary confinement, being exposed to COVID-19, and not being able to see his family for a prolonged and stressful period.

295.    Angwang had severe restrictions placed on his movement while he was being prosecuted and was forced to wear an ankle monitor.

296.    Angwang suffered enormous damage to his otherwise sterling reputation in the NYPD and beyond, among his military colleagues, and in his community because of the false charges.

297.    Angwang's name has been tarnished by national reporting on his case; to this day, an online search for his name brings up many stories documenting the false charges brought against him.

298.    Angwang continues to suffer from shame and emotional trauma and has had to see a therapist as a result.

299.    Angwang also experiences symptoms that include nightmares and hypervigilance.

300.    Angwang experiences feelings of panic when in the presence of law enforcement,

particularly to the extent he encounters or believes he has encountered undercover law enforcement personnel.

301.    Angwang has received diagnoses of depression, anxiety, insomnia, and post-traumatic stress disorder ("PTSD").

302.    From the NYPD's unlawful termination, Angwang has suffered economic damages in the form of backpay and frontpay.

303.    Had the NYPD not unlawfully terminated Angwang, he would have fully intended on continuing working with the NYPD until retirement and then earned his full pension.

304.    And as a result, he also lost the opportunity to take the Civil Service Promotion Exam, which he fully intended to take.

305.    Angwang's experience prior to being arrested, as detailed above, suggests that he would likely have passed and earned the higher title of Sergeant (and likely received further promotions in the future).

306.    Defendant Caban's decision to terminate Angwang against Commissioner Facio-Lince's recommendation meant that Angwang had to forfeit his vested-interest retirement and was unable to use his accumulated unused vacation days.

307.    Angwang did not receive a "good guy" letter, which would have allowed Angwang to obtain a concealed carry handgun license for protection and future work.

308.    Angwang has struggled to find gainful employment because of the damage to his reputation.

## COUNT I
### False Arrest and False Imprisonment
### Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680
### Defendant United States of America

309.    Angwang hereby re-alleges and incorporates by reference all allegations in each

and every preceding paragraph as if fully set forth herein.

310.    The FTCA waives sovereign immunity "with regard to acts or omissions of investigative or law enforcement officers of the United States" for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  28 U.S.C. § 2680(h).

311.    Defendant the United States confined Angwang beginning on September 21, 2020, and then again on October 7, 2020.

312.    Angwang was conscious of and did not consent to the confinement.

313.    The confinement of Angwang was without probable cause and was not otherwise privileged.

314.    Defendant the United States lacked probable cause for the arrest because the arrest warrant was procured through misrepresentation and falsification of evidence in the Deck Complaint, including but not limited to false and misleading translations of Angwang's statements from Mandarin into English, false and misleading representations of the contents of Angwang's communications, material omissions of other statements that would have exculpated Angwang, and false statements about Angwang's SF-86 Form.

315.    These false and misleading statements were material and necessary to secure the warrant.

316.    These actions constituted the tort of false arrest and false imprisonment under the laws of New York.

317.    The actions taken by officers of Defendant the United States are separable from the discretionary decision to prosecute and violated Angwang's rights under the Fourth and Fifth Amendments of the U.S. Constitution.

318.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT II**
**Malicious Prosecution**
**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680**
**Defendant United States of America**

319.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

320.    The FTCA waives sovereign immunity "with regard to acts or omissions of investigative or law enforcement officers of the United States" for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  28 U.S.C. § 2680(h).

321.    Defendant the United States commenced or continued a criminal proceeding against Angwang.

322.    The proceeding terminated in Angwang's favor when all charges were dismissed against him on January 19, 2023.

323.    There was a lack of probable cause to initiate or continue a criminal prosecution of Angwang for any charge.

324.    On information and belief, the grand jury indictment was procured after law-enforcement witnesses of Defendant the United States of America knowingly made a presentation of false and misleading facts, including but not limited to false and misleading translations of Angwang's statements from Mandarin into English, false and misleading representations of the contents of Angwang's communications, material omissions of other portions of communications that would have exculpated Angwang, and false statements about Angwang's SF-86 Form.

325.    Defendant the United States acted in bad faith, as evidenced by a pattern of other meritless prosecutions of people of Chinese ancestry.

326.    Defendant the United States acted with actual malice, as inferred from the absence of probable cause and the United States acting with reckless disregard for Angwang's rights.

327.    The actions taken by officers of Defendant the United States are separable from the discretionary decision to prosecute and violated Angwang's rights under the Fourth and Fifth Amendments of the U.S. Constitution.

328.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT III**
**Abuse of Process**
**Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680**
**Defendant United States of America**

329.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

330.    The FTCA waives sovereign immunity "with regard to acts or omissions of investigative or law enforcement officers of the United States" for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h).

331.    Defendant the United States of America employed regularly issued legal process to compel the performance or forbearance of some act, including, but not limited to, Angwang's deprivation of liberty and subjection to prolonged prosecution.

332.    Defendant the United States of America had an intent to do harm without excuse of justification.

333.    Defendant the United States of America had a collateral objective that was outside the legitimate ends of process.

334.    The tacit aim of the prosecution, as with other cases brought pursuant to the China Initiative and related policies, was to drive people of Chinese descent out of American academic

institutions and government agencies like the NYPD.

335.    This improper collateral objective is evidenced through a series of related cases and in the U.S. DOJ's implicit recognition that the China Initiative was discriminatory.

336.    The actions taken by officers of the United States are separable from the discretionary decision to prosecute and violated Angwang's rights under the Fourth and Fifth Amendments of the U.S. Constitution.

337.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

## COUNT IV
### Intentional Infliction of Emotional Distress
### Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680
### Defendant United States of America

338.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

339.    Through its officers and agents, Defendant the United States of America engaged in extreme and outrageous conduct including, but not limited to fabricating evidence, making false representations, and omitting material exculpatory information.

340.    This conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

341.    Defendant the United States of America had an intent to cause, or reckless disregard of, a substantial probability of causing, severe emotional distress.

342.    There is a causal connection between Defendant the United States of America's conduct and Angwang's injuries.

343.    Specifically, Defendant the United States of America's conduct led directly to emotional distress including, but not limited to: the traumatic arrest of Angwang at gunpoint in

front of his wife and young daughter, prolonged detention in the MDC, and the several-years long prosecution.

344.    As a direct consequence of Defendant the United States of America's actions, Angwang was shunned by his community, received threatening letters, and had his property vandalized.

345.    Angwang has suffered severe emotional distress, as evidenced by seeing a therapist, and receiving diagnoses for PTSD, depression, and anxiety.

346.    The actions taken by officers of the United States are separable from the discretionary decision to prosecute and violated Angwang's rights under the Fourth and Fifth Amendments of the U.S. Constitution.

347.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

### COUNT V
### Malicious Prosecution
### 42 U.S.C. § 1983
### Defendants Cutter, Sparber, and the Doe Defendants

348.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

349.    By way of the foregoing, Defendants Cutter, Sparber, and the Doe Defendants played an active role in initiating, causing the initiation, and/or continuing a criminal proceeding against Mr. Angwang.

350.    Each of the foregoing Defendants played an active role in the prosecution of Angwang.

351.    Through the foregoing, each of the foregoing Defendants caused Angwang to be deprived of his liberty.

352.    The termination of the criminal proceeding ended in Angwang's favor when all

charges against him were dismissed on January 19, 2023.

353.    There was never probable cause to initiate or continue a criminal prosecution of Angwang for any charge.

354.    Each of the foregoing Defendants acted with actual malice.

355.    The foregoing conduct of each of the foregoing Defendants were actions they each took under color of state law.

356.    At all relevant times, none of the foregoing Defendants were acting in a prosecutorial capacity, but rather were acting in a private capacity, an investigative capacity, and/or in the clear absence of all jurisdiction.

357.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT VI**
**Malicious Prosecution**
**N.Y.C. Admin Code § 8-803**
**Defendants New York City, Cutter, Sparber, and the Doe Defendants**

358.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

359.    By way of the foregoing, Defendants Cutter, Sparber, and the Doe Defendants knowingly, willfully, and with actual malice initiated, or caused the initiation and continuation of, Angwang's prosecution without probable cause.

360.    The foregoing Defendants were aware that there was no probable cause when they initiated, or caused the initiation and continuation of, Angwang's prosecution.

361.    The foregoing Defendants caused Angwang to be deprived of his liberty.

362.    Defendant New York City is the employer of the foregoing Defendants and therefore is liable for the misconduct alleged supra.

363.    The termination of the criminal proceeding was in Angwang's favor when all

charges against him were dismissed on January 19, 2023.

364.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

## COUNT VII
### Discrimination in Violation of the Fourteenth Amendment
### 42 U.S.C. § 1983
### Defendants Cutter, Caban, Ricciardi, and Iglesias

365.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

366.    Angwang is a member of a protected class based on his race, national origin, and ethnicity.

367.    Angwang was qualified for his position in the NYPD.

368.    Angwang suffered adverse employment actions including the initiation of disciplinary proceedings on May 17, 2023, the placement on suspension without pay on June 8, 2023, and the termination of his employment on January 29, 2024.

369.    Angwang's membership in a protected class was the but-for cause of the adverse employment actions taken against him.

370.    Defendants Cutter, Caban, Ricciardi, and Iglesias acted under the color of state law and were personally involved in the foregoing violations, as alleged herein.

371.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

## COUNT VIII
### First Amendment Retaliation
### 42 U.S.C. § 1983
### Defendants Cutter, Caban, Ricciardi, and Iglesias

372.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

373.    Angwang engaged in protected First Amendment speech.

374.    Specifically, in January and February 2023, Angwang spoke to the press about the

unlawful treatment he received at the hands of federal and New York City law enforcement.

375.    Angwang was speaking as a citizen on a matter of public concern.

376.    Angwang also engaged in protected First Amendment activity by filing a Notice of Claim against New York City on April 15, 2023.

377.    On information and belief, Defendants Cutter, Caban, Ricciardi, and Iglesias were aware of and/or had constructive knowledge of this protected activity.

378.    Beginning a month later, Defendants undertook the first of a series of adverse employment actions that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

379.    Specifically, Defendant Cutter initiated disciplinary charges on May 17, 2023, and scheduled a hearing with a highly unusual number of days and questions.

380.    These disciplinary charges eventually led to Angwang's termination.

381.    Close temporal proximity exists between Angwang's protected speech and the adverse employment actions.

382.    The initial reason given for the disciplinary charges—the charges related to the dismissed federal prosecution—was pretextual.

383.    Specifically, as federal prosecutors had already indicated in the dismissal hearing, there was no evidence that Angwang had committed a crime.

384.    Moreover, the charges were pretextual because the ultimate reason given for Angwang's termination—that he refused a lawful order—were different from the reason given for the initiation of disciplinary charges.

385.    Angwang was also treated differently from similarly situated comparators, including but not limited to the unusual number of questions that Defendants intended to ask

Angwang and Defendant Caban's decision to increase the Trial Commissioner's recommendation of separation to immediate termination.

386.    This treatment was distinct from similarly situated comparators, who, on information and belief, did not engage in First Amendment protected activity.

387.    Defendants Cutter, Caban, Ricciardi, and Iglesias acted under the color of state law and were personally involved in the violations as alleged herein.

388.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT IX**
**Racial Discrimination in Contracting**
**42 U.S.C. § 1981**
**Defendants Cutter, Caban, Ricciardi, and Iglesias**

389.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

390.    Angwang is a member of a racial minority.

391.    Defendants Cutter, Caban, Ricciardi, and Iglesias intended to discriminate against Angwang in subjecting him to disciplinary proceedings, suspending him without pay, and terminating his employment.

392.    The discrimination concerned one of 42 U.S.C. § 1981's enumerated activities, specifically, the right to make and enforce contracts, *id.* § 1981(a).

393.    Angwang's race was the but-for cause of the discriminatory actions.

394.    The foregoing Defendants acted under the color of state law and were personally involved in the violations as alleged herein.

395.    As a consequence of this discrimination, Angwang has suffered damages.

**COUNT X**
**Discrimination on the Basis of Race/National Origin**
**N.Y. Exec. Law § 296(1)(a), (h)**
**Defendants the City of New York, Cutter, Caban, Ricciardi, and Iglesias**

396.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

397.    Angwang was an "employee" of Defendant the City of New York under the definition of the New York Executive Law.

398.    Defendants the City of New York, Cutter, Caban, Ricciardi, and Iglesias are "employer(s)" and "covered entit(ies)" under the definition of the New York Executive law.

399.    At all relevant times, Angwang was Asian/an ethnic Tibetan/of Chinese national origin and was thus a member of protected race/ethnicity/national origin groups.

400.    Angwang was an "individual" in an "employment" relationship with the foregoing Defendants for purposes of the New York Executive Law.

401.    The foregoing Defendants discriminated against Angwang on the basis of race, national origin, and ethnicity by treating him differentially and worse than NYPD Officers who did not share Angwang's protected group membership.

402.    The foregoing Defendants subjected Angwang to adverse employment actions including initiating disciplinary proceedings and terminating his employment.

403.    Defendants acted intentionally or with reckless indifference.

404.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT XI**
**Discrimination on the Basis of Race/National Origin**
**N.Y.C. Admin. Code §§ 8-107(a)(1), 8-502**
**Defendants the City of New York, Cutter, Caban, Ricciardi, and Iglesias**

405.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

406.    Defendants were each an "employer" and a "covered entity" for purposes of Section 8-107.

407.    At all relevant times, Angwang was Asian/an ethnic Tibetan/of Chinese national origin and was thus a member of protected race/ethnicity/national origin groups.

408.    The foregoing Defendants discriminated against Angwang on the basis of race, national origin, and ethnicity by treating him differentially and worse than NYPD Officers who did not share Angwang's protected group membership.

409.    The foregoing Defendants subjected Angwang to adverse employment actions including initiating disciplinary proceedings and terminating his employment.

410.    Defendants acted intentionally or with reckless indifference.

411.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

**COUNT XII**
**Retaliation**
**N.Y. Exec. Law § 296(7)**
**Defendants the City of New York, Cutter, Caban, Ricciardi, and Iglesias**

412.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

413.    Angwang was an "employee" of Defendant the City of New York under the definition of the New York Executive Law.

414.    Defendants the City of New York, Cutter, Caban, Ricciardi, and Iglesias are an

"employer" and "covered entity" under the definition of the New York Executive Law.

415.    Angwang was an "individual" in an "employment" relationship with Defendants for purposes of the New York Executive Law.

416.    Angwang engaged in protected activity under the New York Executive Law by opposing practices forbidden under Section 296, specifically race/ethnicity/national origin discrimination, including but not limited to his comments to the public press in January and February 2023 and his counsel's communications in June 2023 stating that he had been discriminated against.

417.    The foregoing Defendants knew that Angwang engaged in protected activity.

418.    The foregoing Defendants retaliated against Angwang including but not limited to by: forcing Angwang to stay later than other suspended officers, denying his requests for vacation, initiating the GO-15 hearing and disciplinary proceedings, and terminating his employment.

419.    The foregoing Defendants undertook their retaliatory actions because of Angwang's opposition to discrimination, and that retaliation came in close temporal proximity with Angwang's protected activity.

420.    The foregoing Defendants acted intentionally or with reckless indifference.

421.    As a consequence of the foregoing, Angwang suffered damages as alleged herein.

<u>**COUNT XIII**</u>
**Retaliation**
**N.Y.C. Admin. Code § 8-107(7)**
**Defendants City of New York, Cutter, Caban, Ricciardi, and Iglesias**

422.    Angwang hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

423.    Defendant the City of New York was an "employer" and a "covered entity" for purposes of Section 8-107.

424.     Angwang engaged in protected activity under Section 8-107 by opposing a practice forbidden by the chapter, specifically race/ethnicity/national origin discrimination, including but not limited to his comments to the public press in January and February 2023 and his counsel's communications in June 2023 stating that he had been discriminated against.

425.     Defendants acted intentionally or with reckless indifference.

426.     As a consequence of the foregoing, Angwang suffered damages as alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Angwang prays for relief and demands judgment in his favor on each of his claims against Defendants as follows:

(a)     Declaring and adjudging that Defendants' acts alleged herein violated Angwang's rights under the laws of the United States, the United States Constitution, the State of New York, and the City of New York;

(b)     Entering judgment in favor of Angwang and order that Angwang shall recover

    (i)     compensatory damages against each of the Defendants, jointly and severally, to compensate Angwang for his economic damages, including backpay and front pay and lost pension, past, present, and future pain, suffering, and other hardships arising from the Defendants' conduct; and

    (ii)     punitive damages against the City of New York and each of the individual Defendants;

(c)     Awarding Angwang the costs of the suit herein, including but not limited to attorney's fees;

(d)     Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       January 19, 2026

                                        By:    /s/ Fred Lichtmacher
                                        _____

                                        **THE LAW OFFICE OF**
                                        **FRED LICHTMACHER P.C.**
                                        Fred Lichtmacher, Esq.
                                        159 West 25th Street, Room 510
                                        New York, New York 10011
                                        (212) 922-9066
                                        empirestatt@aol.com


                                        *Attorney for Plaintiff Baimadajie Angwang*