UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAIMADAJIE ANGWANG,<br><br>Plaintiff,<br><br>-v-<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | 26 Civ. 478 (JPC)<br><br><u>OPINION AND ORDER</u> |

JOHN P. CRONAN, United States District Judge:

Plaintiff Baimadajie Angwang asserts that Defendants United States of America, City of New York, and several officers and employees of the New York City Police Department ("NYPD") falsely imprisoned him, maliciously prosecuted him, abused legal process against him, intentionally inflicted emotional distress on him, and retaliated and discriminated against him in his employment as an NYPD officer. The United States has moved to transfer venue to the Eastern District of New York ("EDNY"), and Angwang consents to this transfer. The City and the NYPD officers and employees oppose transfer and, in the alternative, request severance so that the claims against them remain in this District. For the reasons below, the Court grants the United States's motion, declines to sever, and transfers this case to the EDNY.

## I. Background

### A. Facts[1]

Angwang is a U.S. citizen who immigrated from Tibet as a teenager and subsequently joined the U.S. Marine Corps. Complaint ¶¶ 27-35. After his tenure in the armed forces, Angwang became an officer in the NYPD, where he served from 2015 to 2024. *Id.* ¶¶ 64, 286. The NYPD assigned Angwang—who lives in Nassau County, Long Island—to the 111th Precinct in Queens. *Id.* ¶¶ 16, 64.

In 2017, while serving in the NYPD, Angwang "sought a ten-year visa" to visit Tibet; his daughter had just been born, and he hoped to travel so that his parents and in-laws could spend time with their grandchild. *Id.* ¶¶ 3, 90-92. "As part of [this] effort to secure a longer-term visa," Angwang "communicated" on "his personal cell phone" with "low-ranking employee[s]" at the Chinese Consulate in Manhattan. *Id.* ¶¶ 93-97.

At around the same time, the Federal Bureau of Investigation ("FBI") and NYPD's Internal Affairs Bureau ("IAB") "began investigating Angwang"—with the FBI leading the investigation and IAB playing an "instrumental" supporting role. *Id.* ¶¶ 106, 115 & n.5. As part of the investigation, the FBI "intercepted certain of [Angwang's] communications with employees at the Chinese Consulate." *Id.* ¶ 118. Relying on these calls and messages, FBI Special Agent Stephen Deck drafted an affidavit and federal criminal complaint (the "Deck Affidavit"), accusing Angwang of acting as a "foreign agent for the Chinese government." *Id.* ¶¶ 5, 135, 138. On

[1] The Court derives the following facts—which it accepts as true for purposes of this Opinion and Order—from the Complaint, Dkt. 1 ("Complaint"). *See, e.g.*, *Dickerson v. Novartis Corp.*, 315 F.R.D. 18, 23 n.1 (S.D.N.Y. 2016) (explaining that courts generally "accept[] as true facts alleged by [the] plaintiff or otherwise undisputed in deciding motion[s] to transfer [venue]"); *Cerussi v. Union Coll.*, 144 F. Supp. 2d 265, 266 (S.D.N.Y. 2001) (same).

September 19, 2020, Deck filed this affidavit in the EDNY and the Honorable Ramón E. Reyes, Jr., then a U.S. Magistrate Judge, authorized an arrest warrant. *Id.* ¶¶ 156-159.

Law enforcement responded quickly. On September 21, 2020, a Special Weapons and Tactics ("SWAT") team armed with M4 rifles seized Angwang at his home on Long Island and took him into custody. *Id.* ¶¶ 161-162. There he remained: in light of the allegations articulated in the Deck Affidavit, the Honorable Eric Komitee, a U.S. District Judge in the EDNY, denied Angwang bail on October 7, 2020. *Id.* ¶¶ 170-171; *United States v. Angwang*, No. 20 Mag. 837 (EK) (RER), 2020 WL 5947187, at *1 (E.D.N.Y. Oct. 7, 2020). And a few weeks later, on October 13, 2020, a grand jury in the EDNY—allegedly relying on the same facts as those set forth in the Deck Affidavit—indicted Angwang on four Counts related to his alleged espionage: "acting as an agent of a foreign government in violation of 18 U.S.C. § 951; wire fraud in violation of 18 U.S.C. § 1343; making false statements in violation of 18 U.S.C. § 1001; and obstructing an official proceeding in violation of 18 U.S.C. § 1512." Complaint ¶¶ 172-173; *accord United States v. Angwang*, No. 20 Cr. 442 (EK) (E.D.N.Y.), Dkt. 20 (Oct. 13, 2020). On May 17, 2021, the NYPD followed suit, initiating internal administrative charges that "mirrored precisely the same four federal charges contained in Angwang's indictment." Complaint ¶¶ 199-201.

In the meantime, Angwang was detained at the Metropolitan Detention Center ("MDC") in Brooklyn, where he endured what he describes as "abysmal" conditions. *Id.* ¶¶ 176-178. It was not until February 16, 2021—almost five months after his initial arrest—that Angwang was finally released from the MDC on bond and "placed on home detention." *Id.* ¶¶ 176, 191-192. This home detention would last nearly two more years. *Id.* ¶ 203.

On January 13, 2023, however, federal prosecutors in the U.S. Attorney's Office for the EDNY moved to dismiss the indictment, *id.* ¶ 203, citing (unspecified) "additional information

bearing on the charges," *id.* ¶ 204 (internal quotation marks omitted). *See Angwang*, No. 20 Cr. 442 (EK) (E.D.N.Y.), Dkt. 138 (Jan. 13, 2023). On January 19, 2023, Judge Komitee granted the Government's motion, dismissing the indictment and closing the case. *See id.*, Dkt. 140 (Jan. 19, 2023). Five days later, Angwang spoke to the press, criticizing the prosecution and musing that racial prejudice may have played a role. Complaint ¶¶ 211-213. Angwang then followed up, on February 9, 2023, by taping an interview with the Associated Press, where he aired similar concerns. *Id.* ¶ 214. Then, on April 15, 2023, Angwang notified the City of New York that he would be pursuing a lawsuit against it. *Id.* ¶¶ 215-216.

But Angwang's troubles were not over: in May 2023, IAB "notified Angwang" that it was still pursuing its administrative charges against him "for the same conduct" as in the federal criminal case. *Id.* ¶ 231. IAB also informed Angwang that it would be conducting an "administrative interrogation hearing," and Angwang later learned that IAB planned to "pose about 1,700 questions" over the course of a proceeding that would last more than five days. *Id.* ¶¶ 236, 243-244 (emphasis omitted). Angwang responded by "retain[ing] new counsel to represent him." *Id.* ¶ 249. This new attorney then asked IAB (i) to adjourn the hearing—so that Angwang would have time to prepare—and (ii) to limit the hearing's duration. *Id.* ¶¶ 250-251. IAB declined both requests. *Id.* ¶ 253.

Concluding that he had "no choice but to not participate in" the hearing, Angwang notified IAB that he would not attend. *Id.* ¶ 258 (internal quotation marks omitted). On June 5, 2023, IAB responded by filing new administrative charges against Anwang for "fail[ing] to appear at an Official Department Interrogation." *Id.* ¶ 264. The NYPD subsequently suspended Angwang, and—after an internal trial—the then-Commissioner of the NYPD ordered Angwang's "immediate

dismissal from the NYPD," even though the official overseeing the trial had recommended a more lenient sanction. *Id.* ¶¶ 265, 283-286.

**B. Procedural History**

On January 19, 2026, Angwang sued the United States of America, as well as the City of New York and several NYPD officers and employees (collectively, the "City Defendants"). Angwang generally alleges that the Deck Affidavit—the cornerstone of the various proceedings against him—was an "extraordinary and lawless document" that "falsely implicate[d]" him by "mistranslat[ing]" certain communications, "omit[ing] a trove of" relevant messages, and fabricating out of whole cloth other statements that Angwang "simply never said." *Id.* ¶¶ 5, 137.

Angwang brings thirteen separate claims, which fall into three general buckets. First, in Counts One through Four, Angwang invokes the Federal Tort Claims Act ("FTCA"), alleging that the United States falsely imprisoned him, maliciously prosecuted him, abused legal process against him, and intentionally inflicted emotional distress on him by arresting, indicting, and detaining him. *Id.* ¶¶ 309-347. Second, in Counts Five and Six, Angwang asserts similar malicious-prosecution claims—under 42 U.S.C. § 1983 and state law—against the City Defendants, on the theory that the NYPD "played an active role" in the EDNY prosecution. *Id.* ¶¶ 348-364. Finally, in Counts Seven through Thirteen, Angwang contends that the City Defendants (i) discriminated against him in his employment on account of his race or national origin and (ii) retaliated against him for his protected speech, in violation of the First and Fourteenth Amendments to the U.S. Constitution, 42 U.S.C. §§ 1983 and 1981, and various analogous provisions of state law. *Id.* ¶¶ 365-426.

On August 28, 2026, the City Defendants announced that they intended to move to dismiss the claims against them. Dkt. 32 ("City MTD Ltr."). A few days later, on September 4, 2026, the

United States filed its own letter arguing that the Court should transfer venue from this District to the EDNY. Dkt. 34 ("U.S. Mot."). On September 15, 2026, Angwang consented to such transfer. Dkt. 39 ("Angwang Ltr."). But the City Defendants disagreed: on September 18, 2026, they objected to any transfer of venue and, alternatively, asked for severance such that the claims against them would remain in this District. Dkt. 41 ("City Opp.").

On October 13, 2026, the Court held a conference to discuss the venue-transfer motion. *See* Dkt. 43 ("Oct. 13, 2026 Tr."). At the conference, the parties agreed that (i) the Court would construe the United States's pre-motion letter as a motion to transfer, and the City Defendants' response as its briefing in opposition; (ii) the parties did not need to file any further papers; and (iii) the Court would hold in abeyance the City Defendants' request for leave to move to dismiss pending its ruling on the venue-transfer motion. *Id.* at 12:21-14:1.

## II. Legal Standard

"A district court may exercise its discretion to transfer venue 'for the convenience of parties and witnesses, in the interest of justice.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010) (quoting 28 U.S.C. § 1404(a)). When weighing these concerns, a district court considers "(1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *Id.* In analyzing these factors at the pleading stage, a district court will "accept[] as true facts alleged by the plaintiff [in the complaint] or otherwise undisputed," *Dickerson*, 315 F.R.D. at 23 n.1, and "the party requesting transfer [bears] the burden" of showing that the court should shift venue, *N.Y. Marine & Gen. Ins.*, 599 F.3d at 114 (internal quotation marks omitted).

## III. Discussion

The Court concludes that transferring venue to the EDNY would serve the convenience of the parties and witnesses and further the interests of justice. Most of the seven factors identified above do not cut strongly one way or the other: while Angwang brought this case in this District, he has consented to litigate it in the EDNY; the witnesses and relevant documents would appear to span both Districts; and no issues have arisen with respect to the availability of process or the means of the parties. *See id.* at 113. Instead, the parties focus on one key factor—which District better anchors the operative facts. *See* U.S. Mot. at 1-2; Angwang Ltr. at 1-2; City Opp. at 1-2.

The Court finds that the bulk of the relevant facts occurred in the EDNY. This case originates from an aborted espionage prosecution and its follow-on effects, including Angwang's arrest, his indictment, his detention, and the eventual loss of his job. And that prosecution sprung up in the EDNY: Angwang lives there, served as an NYPD officer in a precinct there, litigated his federal criminal case there, and was arrested, indicted, and detained there. *See* Complaint ¶¶ 16, 64, 156-78, 191-192. To take one striking example of a particular fact, Special Agent Deck executed and filed his affidavit—the alleged rotten core of the entire prosecution and all its malignant effects—in the EDNY. *Id.* ¶ 156. In fact, even the City Defendants concede that venue would be proper in that District. *See* Oct. 13, 2026 Tr. at 5:5-6 ("[T]he case could have been brought in the Eastern District.").[2]

[2] It is not clear that venue would lie *at all* in this District as to the FTCA claims in Counts One through Four. An FTCA action "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Angwang resides in the EDNY, and while it is true, as discussed below, that the criminal case against Angwang had certain links to the Southern District of New York, those connections strike the Court as slender bonds when compared to the massive amount of relevant conduct that occurred in the EDNY. The Court need not decide this thorny issue, however, because it transfers the case using its discretion under Section 1404(a). *See* Angwang Ltr. at 2; U.S. Mot. at 2.

The City Defendants nonetheless argue that venue also lies in this District. As for Counts One through Six—which all directly involve the EDNY prosecution—the City Defendants (i) adopt Angwang's letter explaining that the Chinese Consulate is located in this District, *see* City Opp at 1; Angwang Ltr. at 1, and (ii) note that the NYPD officers allegedly assisted with the federal prosecution from their bases at "NYPD headquarters" and from IAB's office on Hudson Street in Manhattan, City Opp. at 2. With respect to the rest of the Counts, the City Defendants emphasize that the NYPD's adverse actions and administrative proceedings against Angwang, which culminated in his firing, all "took place in Manhattan." *Id.* at 2.

But "[e]ven if a case is filed in a jurisdiction where venue is proper, a court may transfer the case to any other district where it might have been brought." *Jean-Louis v. ACS*, No. 22 Civ. 8457 (LJL), 2022 WL 16857359, at *2 (S.D.N.Y. Oct. 14, 2022). Here, while the branches of this case may have spread over the East River and into Manhattan, its roots are in Brooklyn and Queens. For one thing, the EDNY clearly supplies a better venue for roughly half of Angwang's claims (Counts One through Six). Those claims all relate to the federal criminal prosecution and Angwang's allegations of traumatizing experiences facing armed SWAT agents at his home, a mendacious affidavit from Special Agent Deck, "abysmal" conditions at the MDC, and years of home confinement—all events that occurred in the EDNY. This mountain of contacts with the EDNY clearly dwarfs the fact that individuals in Manhattan, *i.e.*, Chinese Consulate officials and NYPD officers, happen to have interacted with the key protagonists in Brooklyn and Queens.

Meanwhile, Angwang's remaining claims—Counts Seven through Thirteen, which address Angwang's firing from the NYPD—have links to both Districts. While venue certainly lies in this District, given that IAB officers investigated Angwang from their Manhattan office, *see* Complaint ¶ 222, venue also exists in the EDNY. After all, Angwang served as an NYPD officer in the

EDNY and his alleged nightmare with the NYPD originated when IAB followed the lead of the federal prosecutors in the EDNY. *See, e.g.*, Complaint ¶ 235 (explaining that the NYPD "alleged the exact same conduct underlying the then-dismissed federal [EDNY] criminal case"). Furthermore, both Angwang and the City are residents of the EDNY. *See Rivera v. United States*, No. 23 Civ. 1448 (VEC), 2023 WL 2919519, at *2 (S.D.N.Y. Mar. 7, 2023) ("The City of New York resides in this judicial [D]istrict and in the Eastern District of New York.") (transferring claims against the City of New York and the United States to the EDNY).

In sum, the EDNY provides an obviously superior venue for about half of Angwang's claims, while both the EDNY and this District serve as adequate venues for the remainder. The Court therefore finds that the convenience of the parties and the interest of justice favor transfer to the EDNY.

The Court must, however, address one final issue: as mentioned, the City Defendants have alternatively proposed that the Court sever Counts One through Four (the claims against the United States) from Counts Five through Thirteen (the claims against the City Defendants) and then transfer only the former to the EDNY. City Opposition at 2. But the only binding authority that the City Defendants rely on for this slice-and-shift procedure expressly noted that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided." *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968) (cited by City Opp. at 2).

Furthermore, the claims here *are* linked: they all arise from the same allegedly false allegations. *See* Complaint ¶ 201 (explaining that the NYPD charges "mirrored precisely the same four federal charges contained in Angwang's indictment"). For instance, Counts Five and Six—

where Angwang alleges that the NYPD assisted the federal prosecutors in Brooklyn—relate directly to the EDNY prosecution and may well rise and fall based on the same arguments and evidence as Counts One through Four. *See, e.g.*, City MTD Ltr. at 2 (arguing that Counts Five and Six fail because "there was probable cause" to prosecute Angwang given the grand jury's indictment, an argument that might also apply to the malicious-prosecution claims against the United States). Indeed, the City Defendants implicitly conceded this point at the October 13th conference by suggesting that the parties could establish "an arrangement to make available in each of the [severed] cases what's produced in one of the cases," and to "transmit" relevant documents between the "different [D]istrict[s]." Oct. 13, 2026 Tr. at 10:24-11:5.

The Court declines that invitation. Instead of taking a set of related claims, splitting it in two, and then jerry-rigging an inter-District document-sharing protocol, the Court finds that the wiser course is simply to transfer this suit from one neighborhood of New York to another. *See* 28 U.S.C. § 112; *D'Esterre v. City of Brooklyn*, 90 F. 586, 587 (C.C.E.D.N.Y. 1898) ("[T]he city of Brooklyn . . . by the Laws of 1897 . . . became consolidated with the city of New York.").

**IV. Conclusion**

For these reasons, the Court (i) grants the United States's motion to transfer venue; (ii) declines the City Defendants' request, in the alternative, to sever Counts One through Four; and (iii) denies as moot the City Defendants' pre-motion letter seeking leave to move to dismiss the Complaint. The Clerk of Court is respectfully directed to close the motions pending at Docket Numbers 32 and 34 and to transfer this case to the Eastern District of New York.

SO ORDERED.

Dated: November 18, 2026
New York, New York

JOHN P. CRONAN
United States District Judge